CROSNER LEGAL, P.C.
Michael T. Houchin (SBN 305541)
mhouchin@crosnerlegal.com
9440 Santa Monica Blvd. Suite 301
Beverly Hills, CA 90210
Tel: (866) 276-7637
Fax: (310) 510-6429
*Attorneys for Plaintiff and the Proposed Class*

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF CALIFORNIA**

EILEEN AVILES, individually, and on behalf of all others similarly situated,

Plaintiff,

v.

HAWAIIAN HOST, LLC,

Defendant.

Case No. 2:26-cv-00600-TLN-JDP

**FIRST AMENDED CLASS ACTION COMPLAINT**

DEMAND FOR JURY TRIAL

## INTRODUCTION

1. Plaintiff Eileen Aviles ("Plaintiff") brings this consumer protection class action against Hawaiian Host, LLC ("Defendant") to remedy a systematic and fraudulent scheme involving the deceptive marketing and sale of chocolate-covered macadamia nut confections.

2. Defendant maintains that it is the largest manufacturer of chocolate-covered macadamias in the world and controls about 80% of the macadamia nut processing capacity in the State of Hawaiʻi. Utilizing this dominant market position, Defendant induces consumers into paying a significant price premium for confections that are deceptively branded as authentic products of Hawaiʻi. Plaintiff and the Class suffered a concrete economic injury-in-fact at the point of sale by paying an inflated premium for products engineered through a low-cost, globalized supply chain that relies heavily on cheap foreign imports.

3. For over a century, Hawaiʻi-grown macadamia nuts have been recognized globally as a premium agricultural commodity, prized for a unique creamy, buttery texture derived from the Islands' volcanic soil and subtropical growing conditions. Unlike generic snack products, macadamia nuts are a distinct, geographically specific ingredient inherently and exclusively associated with the State of Hawaiʻi by the consuming public. Defendant capitalizes on this reputation by adorning the packaging of its Hawaiian Host brand Products ("the Products")[1]— including its ALOHAMACS and MacNut Crunch lines— with iconic Hawaiian landscapes, cultural symbols, and verifiable, affirmative slogans of geographic authenticity, such as "Genuine," "The Original," and localized "Honolulu, HI" origin markers. Taken together, this packaging creates the unambiguous impression that the primary, character defining ingredient is sourced 100% from Hawaiʻi.

4. In reality, Defendant's products sold on the "mainland," including in California, are comprised of cheaper, foreign-grown macadamia nuts imported for pennies on the dollar from regions such as South Africa and Australia. Defendant's CEO, Ed Schultz, recently

---

[1] The Products include all Hawaiian Host brand products that contain macadamia nuts as an ingredient.

CROSNER LEGAL, P.C.

admitted that the volume of nuts required for their global distribution "exceeds what [they] can source from [their] own local orchards or other high-quality growers in Hawai'i" and explicitly confirmed that these imported nuts are "primarily used in Hawaiian Host products manufactured and sold on the mainland."[2]

5. Despite this reliance on foreign macadamia nuts for its California consumers, Defendant utilizes crafty marketing terms such as "AlohaMacs" and "It truly is Hawai'i's Gift to the World" to reinforce the Hawaiian identity of its primary ingredient without disclosing the foreign source. Plaintiff and the proposed Class sought to purchase authentic Hawaiian confections but were instead misled by Defendant's deceptive branding into subsidizing a global supply chain of foreign nuts while paying Hawai'i-level prices.

6. Plaintiff seeks to represent a California class of consumers for Defendant's violations of the Consumers Legal Remedies Act, Cal. Civ. Code §§ 1750, *et seq.* ("CLRA") and Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200, *et seq.* ("UCL").

## JURISDICTION AND VENUE

7. This Court has original jurisdiction over this action pursuant to 28 U.S.C. § 1332(d) because this is a class action in which: (1) there are over 100 members in the proposed class; (2) members of the proposed class have a different citizenship from Defendant; and (3) the claims of the proposed class members exceed $5,000,000 in the aggregate, exclusive of interest and costs.

8. This Court has personal jurisdiction over Defendant because Defendant conducts and transacts business in the State of California, contracts to supply goods within the State of California, and supplies goods within the State of California. Defendant, on its own and through its agents, is responsible for the distribution, marketing, labeling, and sale of the Products in California, specifically in this judicial district. The marketing of the Products, including the decision of what to include and not include on the labels, emanates from Defendant. Thus,

---

[2] Ryann Noelani Coules, *Not Grown in Hawai'i,* HAWAII BUSINESS MAGAZINE (May 20, 2025), *available at* https://www.hawaiibusiness.com/not-grown-in-hawaii/ A copy of this article is also attached as **Exhibit A** to this complaint.

CROSNER LEGAL, P.C.

Defendant has intentionally availed itself of the markets within California through its advertising, marketing, and sale of the Products to consumers in California, including Plaintiff. The Court also has specific jurisdiction over Defendant as it has purposefully directed activities towards the forum state, Plaintiff's claims arise out of those activities, and it is reasonable for Defendant to defend this lawsuit because it has sold deceptively advertised Products to Plaintiff and members of the Class in California. By distributing and selling the Products in California, Defendant has intentionally and expressly aimed conduct at California which caused harm to Plaintiff and the Class that Defendant knows is likely to be suffered by Californians.

9. Venue is proper pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claim occurred in this District. Plaintiff purchased one of the Products within this District.

## PARTIES

10. Defendant Hawaiian Host, LLC is a Hawai‘i limited liability company that maintains its principal place of business in Honolulu, Hawai‘i. At all times during the class period, Defendant was the manufacturer, distributor, marketer, and seller of the Products.

11. Plaintiff Eileen Aviles is a resident of California. Plaintiff purchased ALOHAMACS and MacNut Crunch Products during the class period in California. Plaintiff relied on Defendant's deceptive advertising and labeling claims as set forth below.

## FACTUAL ALLEGATIONS

### A. Defendant's Packaging Represents to Consumers that the Macadamia Nuts are Sourced from Hawai‘i

12. Defendant intentionally utilizes Hawaiian branding, iconic geographic imagery, and affirmative slogans of origin to induce reasonable consumers into believing that its macadamia nut products are sourced 100% from Hawai‘i orchards.

**The ALOHA MACS Product**

13. As shown in the image below, the front label of Defendant's "AlohaMacs" packaging features a collage of imagery inextricably linked to the State of Hawai‘i, including a

specific depiction of the Diamond Head landmark, a breaking ocean wave, tropical hibiscus flowers, and a woman in traditional Hawaiian attire wearing a floral lei.




14. This geographic indicia is reinforced by prominent, affirmative representations of authenticity and origin. The front label features the brand name "Hawaiian Host" and the product name "ALOHAMACS," both of which use "Hawaiian" and "Aloha" as adjectives to modify the product, creating an immediate and affirmative representation of geographic origin. Such descriptive brand names require little thought from the consumer and create a nearly insurmountable assumption of geographic source.

15. Further, the packaging features a circular gold seal stating: "THE ORIGINAL GIFT OF ALOHA". Below the brand name, the label provides a specific historical promise: "OVER 80 YEARS OF GENUINE. CLASSIC. ORIGINAL." These slogans function as factual assertions that the product conforms to the original standards of the brand—specifically, the use of authentic Hawai'i-grown nuts.

16. As shown in the image below, the back of the packaging contains a detailed narrative that emphasizes the product's local heritage, stating that the founder's "magical recipe

CROSNER LEGAL, P.C.

for chocolate-dipped macadamias created a sensation on his home island of Maui” and that he later moved to Honolulu to fill orders “all over Oʻahu”.




17. The back label narrative explicitly distinguishes Defendant’s products from those of competitors by claiming: “This is real Hawaiian Host - Genuine. Classic. Original. It truly is Hawaiʻi’s Gift to the World.”

18. Finally, Defendant includes an “Our Promise to You” section which states that “Hawaiian Host products are made with aloha”.

19. Taken as a whole, the entire mosaic of the packaging—from the Diamond Head imagery to the repeated use of “Genuine,” “Hawaiian,” and “Aloha”—leads a reasonable consumer to the unambiguous conclusion that the macadamia nuts contained within the package are sourced from Hawaiʻi. Consumers are not expected to look beyond these pervasive representations to discover the truth: that the primary ingredient for mainland and international distribution is frequently a cheaper, foreign-grown import from Africa or Australia.

20. The representations and images on the packaging of the Products are hereinafter referred to as “the false Hawaiian origin claims.”

CROSNER LEGAL, P.C.

**The MacNut Crunch Product**

21. To maximize corporate profits on the United States mainland, Defendant employs an identical, fraudulent branding scheme on its MacNut Crunch product line. Defendant utilizes affirmative geographic slogans and heritage-based representations to construct a false impression that the primary ingredient—the macadamia nuts—are sourced exclusively from the State of Hawai'i.

22. As shown in the true and correct photograph of the front packaging below, the consumer-facing label prominently displays the trademarked brand name "Hawaiian Host" and designates the confections as "THE ORIGINAL CHOCOLATE COVERED MACADAMIA SINCE 1927."




23. The use of "Hawaiian" as an explicit adjective modifying the brand name works in tandem with absolute markers of historic authenticity ("The Original," "Since 1927") to create an objective representation of geographic content. This textual representation is superimposed over highly specific regional illustrations inextricably linked to the State of Hawai'i, featuring cascading volcanic ridges, native tropical flora, and traditional Hawaiian agricultural terrace fields.

24. This deceptive front-label framework is reinforced by a detailed historical narrative and specific corporate identifiers printed on the back of the packaging. As shown in the true and correct photograph below, Defendant prints a localized biography declaring that the founder's dynamic recipe "created a sensation on his home island of Maui," and explicitly promises consumers that "our classic confections reflect our deep connection to Hawai'i":




25. Crucially, the back label prints a specific, localized manufacturing origin marker and corporate address: "**Hawaiian Host LLC, Honolulu, HI 96817 USA**."

26. Taken as a whole, the entire packaging mosaic of the MacNut Crunch product line—from the volcanic mountain illustrations to the explicit "Honolulu, HI" corporate marker—leads a reasonable consumer to the unambiguous conclusion that the character-defining macadamia nut ingredients are harvested from orchards within the State of Hawai'i.

27. Reasonable consumers are not expected to look beyond these pervasive, affirmative representations to discover the omitted truth: that Defendant systematically utilizes its mainland supply chain to substitute cheaper, foreign imports from Africa or Australia in place of premium Hawai'i-grown agricultural commodities.

**B. Consumers Pay a Premium for Hawai‘i-Grown Macadamia Nuts**

28. Macadamia nuts are a specialty agricultural commodity inextricably linked to the cultural identity and agricultural reputation of the State of Hawai‘i. While indigenous to Australia, the commercial macadamia industry was pioneered and developed in Hawai‘i starting in the late 19th century.[3] Over more than a century of research and cultivation, Hawai‘i established itself as the global benchmark for quality, historically producing approximately 95% of the world's macadamia kernel.[4]

29. Hawai‘i-grown macadamia nuts are recognized by consumers and agricultural scientists alike as a premium product, primarily due to the unique “creamy, buttery texture” resulting from the Islands' volcanic soil and subtropical growing conditions.[5] The specific environmental factors in Hawai‘i—including pure water furthest from any continent and nutrient-rich volcanic soil—produce a kernel with a high oil content (often 66% or more) and a flavor profile that is distinctive and superior to nuts grown in other geographic regions, such as Africa or Australia.[6]

30. The superiority of Hawai‘i macadamias is further ensured by decades of intensive selective breeding conducted by the University of Hawai‘i and the Hawai‘i Agricultural Experiment Station. These programs developed specific Macadamia integrifolia cultivars—given Hawaiian names like ‘Keauhou’, ‘Nuuanu’, and ‘Keaau’ to associate them with their local origin—that produce kernels of consistent high quality, uniform size, and full flavor.[7]

---

[3] *See* Gordon T. Shigeura & Hiroshi Ooka, *Macadamia Nuts in Hawaii: History and Production*, UNIV. HAW. RESEARCH EXTENSION SERIES 039, 6, 11 (1984), *available at* https://www.ctahr.hawaii.edu/oc/freepubs/pdf/res-039.pdf

[4] *See* David Rietow, *A Hard Nut to Crack: Macadamia in Hawaii*, 47(10) HORTSCIENCE 1405, 1407 (2012), *available at* https://journals.ashs.org/hort/hort/published/rest/pdf-watermark/v1/journals/hortsci/47/10/article-p1405.pdf/watermark-pdf/

[5] Coules, *supra*.

[6] *See* Shigeura & Ooka, supra, at 17, 21, 23.

[7] *See* Shigeura & Ooka, *supra*, at 19; J.T. Keeler & E.T. Fukunaga, *The Economic and Horticultural Aspects of Growing Macadamia Nuts Commercially in Hawaii*, UNIV. HAW. AGRIC. ECON. BULL. No. 27, 5 (1968).



CROSNER LEGAL, P.C.

CROSNER LEGAL, P.C.

31. Because of this reputation for unmatched quality and authentic heritage, Hawai‘i-grown macadamia nuts command a significant price premium on the retail market.[8] Consumers routinely pay substantially higher prices for authentic "Made in Hawai‘i" confections than they do for other specialty nuts like almonds or walnuts, or for macadamias sourced from foreign producers.[9] For many visitors and residents, these nuts represent an iconic "gift of aloha" and a "gift to the world," making the geographic origin of the nuts a material factor in their purchasing decisions.[10]

**C. Defendant Knowingly Substitutes Premium Hawai‘i Macadamia Nuts with Inferior Foreign Nuts While Charging Mainland Consumers a "Hawai‘i Premium"**

32. To maximize corporate profits at the expense of mainland consumers, Defendant has knowingly engaged in a systematic practice of substituting premium Hawai‘i-grown nuts with cheaper, foreign-sourced kernels for products distributed in California. While Defendant utilizes authentic local nuts for a portion of its sales within the State of Hawai‘i, it reserves inferior, foreign nuts for the "flood" of products destined for the mainland. Defendant's President and CEO, Ed Schultz, explicitly admitted this bifurcation in its supply chain, stating that "imported nuts are primarily used in Hawaiian Host products manufactured and sold on the mainland."[11]

33. The economic incentive driving this deceptive substitution is significant, as foreign-grown macadamia nuts can be purchased for "pennies on the dollar" compared to the cost of production for authentic Hawai‘i-grown nuts. By failing to disclose this foreign origin to California consumers, Defendant extracts an unearned "Hawai‘i premium" while utilizing a low-cost, globalized supply chain. In 2024 alone, Defendant imported approximately 1.5 million kernel pounds of foreign nuts—representing roughly 30% of the entire annual production of the

---

[8] *See* Coules, *supra*.

[9] *See* Shigeura & Ooka, *supra*, at 22.

[10] *See* Coules, *supra*.

[11] *Id.*

State of Hawaiʻi—yet continued to market these products under the "Hawaiian Host" brand without qualification.[12]

34. The foreign kernels Defendant imports from regions such as South Africa and Australia frequently suffer from quality and freshness issues that are not present in locally sourced nuts. These imported nuts often spend "extended periods" in storage and transport before being raw-processed and pasteurized in Hawaiʻi, creating uncertainties regarding food safety and ethical labor practices. This practice not only deceives the consumer but also taints the quality and global perception of authentic Hawaiʻi macadamias.[13]

35. Defendant further leverages its monopolistic market position to facilitate this deceptive sourcing, as it owns and controls approximately 80% of the macadamia nut processing capacity in Hawaiʻi. In 2022, Defendant shut down the Keaʻau nut cracking facility—the largest in the state—claiming it no longer met environmental standards. This shutdown systematically reduced the ability of independent local farmers to process their nuts, forcing many to sell at a loss or go out of business. Defendant then utilized this self-created "lack of capacity" as a pretext to increase its reliance on cheaper foreign imports while maintaining its deceptive "Hawaiian" branding for the California market.[14]

36. Despite these admitted sourcing practices, Defendant continues to utilize identical "Hawaiian Host" and "AlohaMacs" packaging for its mainland confections, ensuring that reasonable consumers remain unaware that the macadamia nuts are actually a foreign import. This intentional omission constitutes a material misrepresentation that directly induces consumers to pay a premium price they would not otherwise pay for an inferior product.

---

[12] *See* Coules, *supra*; Rietow, *supra* at 1407.

[13] *See* Coules, *supra*.

[14] *Id.*



CROSNER LEGAL, P.C.

**REASONABLE CONSUMERS ARE DECEIVED BY DEFENDANT'S FALSE HAWAIIAN ORIGIN CLAIMS AND SUFFERED ECONOMIC INJURY**

37. The false Hawaiian origin claims, deceptive packaging mosaics, and material geographic omissions distributed by Defendant are inherently material to reasonable consumers. Empirical consumer behavior data published in the *Journal of Hospitality and Tourism Insights* confirms that geographic authenticity regarding local food products associated with Hawai'i—specifically including macadamia nuts—directly dictates retail value, forms a premium brand status, and alters consumer willingness-to-pay.[15] Utilizing a Contingent Valuation model tracking consumers from the continental United States, this peer-reviewed market research established that over 78% of consumers are explicitly willing to pay a premium price specifically to purchase food that is locally grown in Hawai'i and to financially support the Hawaiian agricultural economy. On average, consumers are willing to pay an additional 6% to 10% more for verified local food products, with a significant segment willing to pay a premium ranging up to 50% more to ensure authentic Hawaiian sourcing.[16]

38. Plaintiff and the members of the putative Class suffered a concrete, actual, and particularized economic injury-in-fact at the exact moment of their transactions. Plaintiff and Class members directly spent and lost out-of-pocket money that, absent Defendant's unfair and deceptive branding, they would not have spent. Under the standard applied by this Court in *Peacock v. Pabst Brewing Co.*, LLC, 491 F. Supp. 3d 713 (E.D. Cal. 2020), a consumer establishes a cognizable injury under California's consumer protection statutes by demonstrating that they paid an inflated premium price in reliance on a deceptive label and would have refused to purchase the product (or paid significantly less) had the truth been disclosed.

39. Defendant extracts an unearned financial windfall by charging mainland consumers a premium Hawai'i Price calibrated to domestic, specialized commodities while

---

[15] Cathrine Linnes et al., *The Local Food Supply, Willingness to Pay and the Sustainability of an Island Destination*, 6 J. HOSPITALITY & TOURISM INSIGHTS 1328 (2023)

[16] *Id.*

intentionally utilizing a lower-cost, globalized supply chain comprised of foreign nuts purchased for pennies on the dollar.

40. Defendant's assertion that a consumer must explicitly prove whether an individual, physically consumed box contained a foreign nut to establish standing is fundamentally untethered to California law. Because Defendant's President and CEO explicitly admitted that imported nuts are systematically bifurcated and "primarily used in Hawaiian Host products manufactured and sold on the mainland," all products distributed across California carry a uniform, structural risk of foreign substitution.

41. The concrete economic injury is the overpayment for a product line that did not conform to its absolute geographic representations. When a manufacturer uniformly brands a product line as "Genuine" and "The Original" Hawaiian confection, but structurally engineers that line out of cheap foreign imports, every consumer who paid the domestic price premium suffers a financial injury at the cash register, regardless of the random distribution of specific nuts within an individual box.

42. Accordingly, Plaintiff and the Class members are entitled to full restitution, disgorgement, and compensatory damages for the purchase price of the Products that were falsely labeled, marketed, and advertised across the State of California.

## PLAINTIFF'S PURCHASE OF THE PRODUCTS

43. Plaintiff Eileen Aviles has purchased the Products, including the milk chocolate ALOHAMACS and MACNUT Crunch Products, from retail stores— including World Market and Grocery Outlet stores— located in or around Suisun City, California and Vacaville, California during the class period. Plaintiff's most recent purchase was in or around February 2025 from a World Market Store located in Vacaville, California.

44. Plaintiff saw and relied on the false Hawaiian origin claims on the labels of the Product. The representations Plaintiff relied on specifically include, but are not limited to, a pervasive and uniform mosaic of text, absolute historical indicators of origin, and iconic regional trade dress that, taken together, create an objective representation of factual geographic source, including the brand name "Hawaiian Host" and the product name "ALOHAMACS," which



CROSNER LEGAL, P.C.

employ “Hawaiian” and “Aloha” as explicit adjectives modifying the confections to denote local origin ; the descriptive historical modifier “THE ORIGINAL CHOCOLATE COVERED MACADAMIA SINCE 1927” prominently displayed on the front label of the MacNut Crunch packaging, which functions as a verifiable, measurable assertion of factual content rather than non-actionable corporate puffery; the distinctive circular gold seals and authenticity stamps affixed to the front packaging, which explicitly promise “THE ORIGINAL GIFT OF ALOHA” and guarantee “OVER 80 YEARS OF GENUINE. CLASSIC. ORIGINAL.,” representing to a reasonable consumer that the confections conform to the brand’s historic standards of using authentic, locally grown components; the extensive, localized heritage narratives printed on the back labels of the Products detailing the company's historical roots, which explicitly promise that the confections “reflect our deep connection to Hawai‘i” and declare that the founder's original recipe “created a sensation on his home island of Maui” before expanding to fill orders “all over O‘ahu”; the highly specific regional imagery and trade dress layout, featuring a detailed photographic collage of the iconic Diamond Head landmark, breaking ocean waves, tropical hibiscus flowers, and vivid illustrations of Hawaiian volcanic ridges and traditional taro patch agricultural terrace fields; and the explicit, localized manufacturing origin marker and commercial corporate identifier printed directly on the reverse side of the packaging: “Hawaiian Host LLC, Honolulu, HI 96817 USA.”

45. Plaintiff would not have purchased the Products, or would have paid less for the Products, had she known that the Products actually contained foreign macadamia nuts. Because Defendant’s President and CEO explicitly admitted that imported, foreign-sourced macadamia nuts are systematically bifurcated and “primarily used in Hawaiian Host products manufactured and sold on the mainland,” every single package distributed across the State of California carries a uniform and substantial risk of ingredient substitution. Consequently, Plaintiff’s concrete economic injury occurred entirely at the moment of the transaction when she was induced to pay an inflated price premium for a product line engineered out of a globalized, cheap supply chain. Because she was forced to absorb this uniform, systemic risk of substitution at the cash register, a post-purchase tracing of the physical nuts contained within her individual boxes is entirely


CROSNER LEGAL, P.C.

non-dispositive. As a result, Plaintiff suffered injury in fact when she spent money to purchase the Product she would not have purchased, or would have paid less for, absent Defendant's misconduct. Plaintiff desires to purchase the Product again if the labels of the products were accurate and if the macadamia nuts in the Products were fully sourced from Hawai'i. However, as a result of Defendant's ongoing misrepresentations, Plaintiff is unable to rely on the Products' advertising and labeling when deciding in the future whether to purchase the Products.

**No Adequate Remedy at Law**

46. Plaintiff and members of the class are entitled to equitable relief as no adequate remedy at law exists. The statutes of limitations for the causes of action pled herein vary. Class members who purchased the Products more than three years prior to the filing of the complaint will be barred from recovery if equitable relief were not permitted under the UCL.

47. The scope of actionable misconduct under the unfair prong of the UCL is broader than the other causes of action asserted herein. It includes Defendant's overall unfair marketing scheme to promote and brand the Products, across a multitude of media platforms, including the product labels, packaging, and online advertisements, over a long period of time, in order to gain an unfair advantage over competitor products. Plaintiff and class members may also be entitled to restitution under the UCL, while not entitled to damages under other causes of action asserted herein (e.g., the CLRA is limited to certain types of plaintiffs (an individual who seeks or acquires, by purchase or lease, any goods or services for personal, family, or household purposes) and other statutorily enumerated conduct).

48. A primary litigation objective in this litigation is to obtain injunctive relief. Injunctive relief is appropriate on behalf of Plaintiff and members of the class because Defendant continues to misrepresent the Products with the false Hawaiian origin claims when the Products actually contain foreign macadamia nuts. Injunctive relief is necessary to prevent Defendant from continuing to engage in the unfair, fraudulent, and/or unlawful conduct described herein and to prevent future harm—none of which can be achieved through available legal remedies (such as monetary damages to compensate past harm). Injunctive relief, in the form of affirmative disclosures or halting the sale of unlawful sold products is necessary to dispel the

public misperception about the Products that has resulted from years of Defendant's unfair, fraudulent, and unlawful marketing efforts. Such disclosures would include, but are not limited to, publicly disseminated statements stating that the macadamia nuts in the Products are actually from foreign sources. An injunction requiring affirmative disclosures to dispel the public's misperception, and prevent the ongoing deception and repeat purchases, is also not available through a legal remedy (such as monetary damages). In addition, Plaintiff is currently unable to accurately quantify the damages caused by Defendant's future harm, because discovery and Plaintiff's investigation has not yet completed, rendering injunctive relief necessary. Further, because a public injunction is available under the UCL, and damages will not adequately benefit the general public in a manner equivalent to an injunction.

49. It is premature to determine whether an adequate remedy at law exists. This is an initial pleading and discovery has not yet commenced and/or is at its initial stages. No class has been certified yet. No expert discovery has commenced and/or completed. The completion of fact/non-expert and expert discovery, as well as the certification of this case as a class action, are necessary to finalize and determine the adequacy and availability of all remedies, including legal and equitable, for Plaintiff's individual claims and any certified class or subclass. Plaintiff therefore reserves her right to amend this complaint and/or assert additional facts that demonstrate this Court's jurisdiction to order equitable remedies where no adequate legal remedies are available for either Plaintiff and/or any certified class or subclass. Such proof, to the extent necessary, will be presented prior to the trial of any equitable claims for relief and/or the entry of an order granting equitable relief.

## CLASS ACTION ALLEGATIONS

50. Plaintiff brings this action as a class action pursuant to Federal Rules of Civil Procedure 23(b)(2) and 23(b)(3) on behalf of the following Class:

> All persons who purchased the Products for personal use in California within the applicable statute of limitations until the date class notice is disseminated.

51. Excluded from the class are: (i) Defendant and its officers, directors, and employees; (ii) any person who files a valid and timely request for exclusion; (iii) judicial

officers and their immediate family members and associated court staff assigned to the case; (iv) individuals who received a full refund of the Products from Defendant.

52. Plaintiff reserves the right to amend or otherwise alter the class definition presented to the Court at the appropriate time, or to propose or eliminate subclasses, in response to facts learned through discovery, legal arguments advanced by Defendant, or otherwise.

53. The Class is appropriate for certification because Plaintiff can prove the elements of the claims on a classwide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claims.

54. Numerosity: Class Members are so numerous that joinder of all members is impracticable. Plaintiff believes that there are thousands of consumers who are Class Members described above who have been damaged by Defendant's deceptive and misleading practices.

55. Commonality: There is a well-defined community of interest in the common questions of law and fact affecting all Class Members. The questions of law and fact common to the Class Members which predominate over any questions which may affect individual Class Members include, but are not limited to:

a. Whether Defendant is responsible for the conduct alleged herein which was uniformly directed at all consumers who purchased the Products;

b. Whether Defendant's misconduct set forth in this Complaint demonstrates that Defendant engaged in unfair, fraudulent, or unlawful business practices with respect to the advertising, marketing, and sale of the Products;

c. Whether Defendant made misrepresentations concerning the Products that were likely to deceive the public;

d. Whether Plaintiff and the Class are entitled to injunctive relief;

e. Whether Plaintiff and the Class are entitled to money damages and/or restitution under the same causes of action as the other Class Members.

56. Typicality: Plaintiff is a member of the Class that Plaintiff seeks to represent. Plaintiff's claims are typical of the claims of each Class Member in that every member of the

Class was susceptible to the same deceptive, misleading conduct and purchased the Products. Plaintiff is entitled to relief under the same causes of action as the other Class Members.

57. Adequacy: Plaintiff is an adequate Class representative because Plaintiff's interests do not conflict with the interests of the Class Members Plaintiff seeks to represent; the consumer fraud claims are common to all other members of the Class, and Plaintiff has a strong interest in vindicating the rights of the class; Plaintiff has retained counsel competent and experienced in complex class action litigation and Plaintiff intends to vigorously prosecute this action. Plaintiff has no interests which conflict with those of the Class. The Class Members' interests will be fairly and adequately protected by Plaintiff and proposed Class Counsel. Defendant has acted in a manner generally applicable to the Class, making relief appropriate with respect to Plaintiff and the Class Members. The prosecution of separate actions by individual Class Members would create a risk of inconsistent and varying adjudications.

58. The Class is properly brought and should be maintained as a class action because a class action is superior to traditional litigation of this controversy. A class action is superior to the other available methods for the fair and efficient adjudication of this controversy because:

a. The joinder of hundreds of individual Class Members is impracticable, cumbersome, unduly burdensome, and a waste of judicial and/or litigation resources;

b. The individual claims of the Class Members may be relatively modest compared with the expense of litigating the claim, thereby making it impracticable, unduly burdensome, and expensive to justify individual actions;

c. When Defendant's liability has been adjudicated, all Class Members' claims can be determined by the Court and administered efficiently in a manner far less burdensome and expensive than if it were attempted through filing, discovery, and trial of all individual cases;

d. This class action will promote orderly, efficient, expeditious, and appropriate adjudication and administration of Class claims;

e. Plaintiff knows of no difficulty to be encountered in the management of this action that would preclude its maintenance as a class action;

f. This class action will assure uniformity of decisions among Class Members;

g. The Class is readily definable and prosecution of this action as a class action will eliminate the possibility of repetitious litigation; and

h. Class Members' interests in individually controlling the prosecution of separate actions is outweighed by their interest in efficient resolution by single class action;

59. Additionally or in the alternative, the Class also may be certified because Defendant has acted or refused to act on grounds generally applicable to the Class thereby making final declaratory and/or injunctive relief with respect to the members of the Class as a whole, appropriate.

60. Plaintiff seeks preliminary and permanent injunctive and equitable relief on behalf of the Class, on grounds generally applicable to the Class, to enjoin and prevent Defendant from engaging in the acts described, and to require Defendant to provide full restitution to Plaintiff and the Class members.

61. Unless the Class is certified, Defendant will retain monies that were taken from Plaintiff and Class members as a result of Defendant's wrongful conduct. Unless a classwide injunction is issued, Defendant will continue to commit the violations alleged and the members of the Class and the general public will continue to be misled.

## FIRST CLAIM FOR RELIEF

**Violation of California's Consumers Legal Remedies Act**

**Cal. Civ. Code § 1750 *et seq.***

62. Plaintiff realleges and incorporates by reference all allegations contained in this complaint, as though fully set forth herein.

63. Plaintiff brings this claim under the CLRA individually and on behalf of the Class against Defendant.

64. At all times relevant hereto, Plaintiff and the members of the Class were "consumer[s]," as defined in California Civil Code section 1761(d).

65. At all relevant times, Defendant was a "person," as defined in California Civil Code section 1761(c).

66. At all relevant times, the Products manufactured, marketed, advertised, and sold by Defendant constituted "goods," as defined in California Civil Code section 1761(a).

67. The purchases of the Products by Plaintiff and the members of the Class were and are "transactions" within the meaning of California Civil Code section 1761(e).

68. Defendant disseminated, or caused to be disseminated, through its advertising, false Hawaiian origin claims, including the Products' labeling that the Products contain macadamia nuts sourced from Hawaiʻi. Defendant failed to disclose that the Products contain macadamia nuts from foreign sources. This is a material misrepresentation and omission as reasonable consumer would find the fact that the Products contain foreign macadamia nuts to be important to their decision in purchasing the Products. Defendant's representations violate the CLRA in the following ways:

a) Defendant misrepresented the source, sponsorship, approval, or certification of the Products (Cal. Civ. Code § 1770(a)(2);

b) Defendant used "deceptive representations or designations of geographic origin in connection" with the sale of the Products (Cal. Civ. Code § 1770(a)(4);

c) Defendant represented that the Products have characteristics, ingredients, uses, and benefits which they do not have (Cal. Civ. Code § 1770(a)(5));

d) Defendant represented that the Products are of a particular standard, quality, or grade, which they are not (Cal. Civ. Code § 1770(a)(7));

e) Defendant advertised the Products with an intent not to sell the Products as advertised (Cal. Civ. Code § 1770(a)(9)); and

f) Defendant represented that the subject of a transaction has been supplied in accordance with a previous representation when it has not (Cal. Civ. Code § 1770(a)(16)).

69. Defendant violated the CLRA because the Products were prominently advertised with the false Hawaiian origin claims, but, in reality, the Products contain macadamia nuts from foreign sources. Defendant knew or should have known that consumers would want to know that the Products contain macadamia nuts from foreign sources.

CROSNER LEGAL, P.C.

70. Defendant's actions as described herein were done with conscious disregard of Plaintiff's and the Class members' rights and were wanton and malicious.

71. Defendant's wrongful business practices constituted, and constitute, a continuing course of conduct in violation of the CLRA, since Defendant is still representing that the Products have characteristics which they do not have.

72. Pursuant to California Civil Code section 1782(d), Plaintiff and the members of the Class seek an order enjoining Defendant from engaging in the methods, acts, and practices alleged herein.

73. Pursuant to California Civil Code section 1782, on or around February 26, 2026, Plaintiff notified Defendant in writing by certified mail of the alleged violations of the CLRA and demanded that Defendant rectify the problems associated with the actions detailed above and give notice to all affected consumers of their intent to so act. Defendant failed to rectify or agree to rectify the problems associated with the actions detailed herein and give notice to all affected consumers within 30 days of the date of written notice pursuant to section 1782 of the CLRA. Accordingly, Plaintiff seeks actual damages, punitive damages, and attorneys' fees and costs for Defendant's violations of the CLRA.

74. Pursuant to section 1780(d) of the CLRA, attached hereto is an affidavit showing that this action was commenced in a proper forum.

**SECOND CLAIM FOR RELIEF**

**Violation of California's Unfair Competition Law**

**Cal. Bus. & Prof. Code § 17200 *et seq.***

75. Plaintiff realleges and incorporates by reference all allegations contained in this complaint, as though fully set forth herein.

76. Plaintiff brings this claim under the UCL individually and on behalf of the Class against Defendant.

77. The UCL prohibits any "unlawful," "fraudulent," or "unfair" business act or practice and any false or misleading advertising.

CROSNER LEGAL, P.C.

78. Defendant committed unlawful business acts or practices by making the representations and omitted material facts (which constitutes advertising within the meaning of California Business & Professions Code section 17200), as set forth more fully herein, and by violating California's Consumers Legal Remedies Act, Cal. Civ. Code §§1750, *et seq.*, California's False Advertising Law, Cal. Bus. & Prof. § 17500, *et seq.*, 15 U.S.C. § 45, and by breaching express and implied warranties. Plaintiff, individually and on behalf of the other Class members, reserves the right to allege other violations of law, which constitute other unlawful business acts or practices. Such conduct is ongoing and continues to this date.

79. Defendant committed "unfair" business acts or practices by: (1) engaging in conduct where the utility of such conduct is outweighed by the harm to Plaintiff and the members of the a Class; (2) engaging in conduct that is immoral, unethical, oppressive, unscrupulous, or substantially injurious to Plaintiff and the members of the Class; and (3) engaging in conduct that undermines or violates the intent of the consumer protection laws alleged herein. There is no societal benefit from deceptive advertising. Plaintiff and the other Class members paid for a Product that is not as advertised by Defendant. Further, Defendant failed to disclose a material fact (that the Products contain macadamia nuts from foreign sources) of which they had exclusive knowledge. While Plaintiff and the other Class members were harmed, Defendant was unjustly enriched by its false misrepresentations and material omissions. As a result, Defendant's conduct is "unfair," as it offended an established public policy. There were reasonably available alternatives to further Defendant's legitimate business interests, other than the conduct described herein.

80. Defendant committed "fraudulent" business acts or practices by making the representations of material fact regarding the Products set forth herein. Defendant's business practices as alleged are "fraudulent" under the UCL because they are likely to deceive customers into believing the Products contain macadamia nuts not from foreign sources.

81. Plaintiff and the other members of the Class have in fact been deceived as a result of their reliance on Defendant's material representations and omissions. This reliance has caused harm to Plaintiff and the other members of the Class, each of whom purchased Defendant's

CROSNER LEGAL, P.C.

Products. Plaintiff and the other Class members have suffered injury in fact and lost money as a result of purchasing the Products and Defendant's unlawful, unfair, and fraudulent practices.

82. Defendant's wrongful business practices and violations of the UCL are ongoing.

83. Plaintiff and the Class seek pre-judgment interest as a direct and proximate result of Defendant's unfair and fraudulent business conduct. The amount on which interest is to be calculated is a sum certain and capable of calculation, and Plaintiff and the Class seek interest in an amount according to proof.

84. Unless restrained and enjoined, Defendant will continue to engage in the above-described conduct. Accordingly, injunctive relief is appropriate. Pursuant to California Business & Professions Code section 17203, Plaintiff, individually and on behalf of the Class, seeks (1) restitution from Defendant of all money obtained from Plaintiff and the other Class members as a result of unfair competition; (2) an injunction prohibiting Defendant from continuing such practices in the State of California that do not comply with California law; and (3) all other relief this Court deems appropriate, consistent with California Business & Professions Code section 17203.

## REQUEST FOR RELIEF

Plaintiff, individually, and on behalf of all others similarly situated, request for relief pursuant to each claim set forth in this complaint, as follows:

a. Declaring that this action is a proper class action, certifying the Class as requested herein, designating Plaintiff as the Class Representative and appointing the undersigned counsel as Class Counsel;

b. Ordering restitution and disgorgement of all profits and unjust enrichment that Defendant obtained from Plaintiff and the Class members as a result of Defendant's unlawful, unfair, and fraudulent business practices;

c. Ordering actual and punitive damages pursuant to the CLRA.

d. Ordering injunctive relief as permitted by law or equity, including enjoining Defendant from continuing the unlawful practices as set forth herein, and ordering Defendant to engage in a corrective advertising campaign;

e. Ordering Defendant to pay attorneys' fees and litigation costs to Plaintiff and the other members of the Class;

f. Ordering Defendant to pay both pre- and post-judgment interest on any amounts awarded; and

g. Ordering such other and further relief as may be just and proper.

**JURY DEMAND**

Plaintiff hereby demands a trial by jury of all claims in this Complaint so triable.

Dated: May 19, 2026

CROSNER LEGAL, P.C.

By: */s/ Michael T. Houchin*
MICHAEL T. HOUCHIN

9440 Santa Monica Blvd. Suite 301
Beverly Hills, CA 90210
Tel: (866) 276-7637
Fax: (310) 510-6429
mhouchin@crosnerlegal.com

*Attorneys for Plaintiff and the Proposed Class*

**Affidavit Pursuant to Civil Code Section 1780(d)**

I, MICHAEL T. HOUCHIN, declare as follows:

1. I am an attorney duly licensed to practice before all of the courts of the State of California. I am one of the counsel of record for Plaintiff.

2. This declaration is made pursuant to § 1780(d) of the California Consumers Legal Remedies Act.

3. Defendant has done, and is doing, business in California, including in this judicial district. Such business includes the marketing, promotion, distribution, and sale of the Products within the State of California.

4. Plaintiff alleges that she purchased the Products in this District.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct. Executed May 19, 2026 at San Diego, California.

CROSNER LEGAL, P.C.

By: */s/ Michael T. Houchin*
MICHAEL T. HOUCHIN

9440 Santa Monica Blvd. Suite 301
Beverly Hills, CA 90210
Tel: (866) 276-7637
Fax: (310) 510-6429
mhouchin@crosnerlegal.com